No. 85.—JAMES P. PERDUE, Clerk, &c. plaintiff in error, *vs.* WILLIAM J. ELLIS, defendant in error.

[1.] The General Assembly have the right, should the public good require it, and public opinion demand it, to pass a law to restrict or even suppress the internal traffic in spirits; and this power may be delegated to a municipal corporation, to be exercised within their corporate limits.

[2.] By the second section of the amended charter of 1854, the Mayor and Council of the City of Griffin "have full power and authority to pass any by-law, regulation or ordinance, that shall appear to them necessary and proper, for the security, welfare and interest of said city, or for preserving the peace, health, good order and government of the same." And the seventh section of the same charter *provides*, "that the Mayor and Council shall have power to license persons to retail, and sell by retail, spirituous liquors, within the said city, according to the ordinances thereof; and that no person or persons shall sell, by retail, any spirituous liquors within the same, without first obtaining such license": *Held*, that an ordinance prescribing $500 as the fee for a retail license, was constitutional and valid.

Mandamus. In Spalding Superior Court. Heard and decided by Judge STARKE, April 28th, 1855.

The petition in this case set forth, that by the charter of the City of Griffin, it is provided that the Mayor and Council shall have power to license persons to retail and sell, by retail, spirituous liquors in said city; and also, to levy a tax of not exceeding fifty per cent. over the State tax, on all persons, professions and property within the corporate limits of said city, subject to taxation by the laws of the State.

That the said council have passed an ordinance requiring all retailers of spirituous liquors, in the City of Griffin, to pay a license fee of $500 for retailing; that the petitioner is a

poor man and unable to pay the required fee; that the peti-
tioner, in April, 1855, went to James P. Perdue, the Clerk
and Treasurer of said Council, and offered to give bond and
security, according to the requirements of said charter, to
keep an orderly house, and proposed to take the prescribed
oath, and to pay the sum of fifty dollars as a license fee, and
that the said Clerk refused to issue the license.   The defend-
ant filed his answer, admitting the main facts set forth in the
petition.

On hearing the return in the case, the Court "adjudged
that a peremptory mandamus do issue, commanding the re-
spondent, on the payment of fifty dollars and the usual fees
by the petitioner, and on his complying with the other regu-
lations of the city ordinances, in regard to such matters, to
issue to the petitioner a license to retail according to his ap-
plication—it being here adjudged that that part of the city
ordinance fixing the price of license at $500, is null and
void," &c.

To which decision and judgment of the Court, Counsel for
respondent excepted.

ALFORD & MOORE, for plaintiff in error.

McCUNE; H. & G. J. GREEN, for defendant in error.

*By the Court.*—LUMPKIN, J. delivering the opinion.

The record does not disclose, nor can we very readily un-
derstand, upon what principle our brother STARKE ordered a
peremptory mandamus to issue, commanding the Clerk of
the Council to grant a license upon the payment of fifty dol-
lars.   If this was the sum formerly paid, the ordinance requir-
ing it was repealed, and a fee of $500 substituted in its place.
The price, therefore, was $500, or it was nothing.   The fact
that $50 is the penalty prescribed for retailing without li-
cense, both by the State law and the city ordinance, is no
reason, of course, why the payment of that sum, in advance,

should entitle the applicant to a retail-license. And upon this ground, alone, the plaintiff in error might claim a reversal of the judgment below.

[1.] But not to rest the decision of so important a question upon such narrow ground, we will consider the case as it has been discussed. It is one, undoubtedly, of the utmost magnitude.

The question involved is one of *power* and not of *expediency*. The former is for the Courts, while the latter belongs to another and more appropriate forum—the ballot-box.

Has the General Assembly of Georgia the right, should the public good require it, and public opinion demand it, to pass a law to restrict or even suppress the traffic in spirits? Have they the power to delegate this authority to a municipal corporation, to be exercised within its limits? And has this privilege been conferred upon the City of Griffin? These are the points to be adjudicated.

1. By the Constitution of 1798, it is declared, that "the General Assembly shall have power to make *all* laws and ordinances which they shall deem necessary and proper, for the good of the State, and which shall not be repugnant to the Constitution." (*Cobb's Digest*, 1115.)

It is not pretended that such an Act would violate any provision of our State Constitution. Would it impair the Constitution of the United States—any law made in pursuance thereof, or any national treaty? Whatever doubts may have existed in *eighteen hundred and thirty-nine*, or before or since, here or elsewhere, upon this subject, it is now no longer an open question.

The License Laws of Massachusetts, Rhode Island and New Hampshire, were brought before the Supreme Court at Washington, at its January Term, 1847. They were ably and fully argued by Mr. Webster, Mr. Choate and many of the leading lawyers of the union, and it was unanimously decided, that the Acts of those several States were not inconsistent with any of the provisions of the Federal Constitution or Statutes of Congress, under it. (5 *Howard's S. C.*

*Rep.* 504.) Six of the Justices gave separate opinions, each for himself.

Chief Justice *Taney*, said: "These laws, restricting the domestic traffic, may discourage imports and diminish the price which ardent spirits would otherwise bring ; still, the State is not bound to abstain from the passage of any law which it may deem necessary or advisable to guard the health and morals of its citizens. And if any State deems the retail and internal traffic in ardent spirits injurious to its citizens, and calculated to produce idleness, vice and debauchery, I see nothing in the Constitution of the United States to prevent it from regulating and restraining the traffic, or *from prohibiting* it altogether. Of the wisdom of this policy, it is not my province or purpose to speak. Upon that subject, each State must decide for itself.".

Said Mr. Justice *McLean*: "In all matters of government, and especially of police, a wide discretion is necessary. It is not susceptible of any exact limitation, but must be exercised under the changing exigencies of society. In the progress of population, of wealth and of civilization, new and vicious indulgences spring up, which require restraints that can only be imposed by the legislative power. And when this power is exerted, how far it shall be carried, and when it shall cease, must mainly depend upon the evil to be remedied. It is clear that the law of a State is not rendered unconstitutional by an incidental reduction of importation. And especially is this not the case, when the State regulation has a salutary tendence on society, and is founded on the highest moral considerations."

Said Mr. Justice *Catron*, "I admit as inevitable, that if the State has the power of restraint, by license, to *any extent*, she has the discretionary power to judge of its limit; and may go to the length of prohibiting sales altogether, if such be her policy. And if the Court cannot interfere in the case before us," (and he admitted it could not,) ".so, neither could we interfere in the extreme case of entire exclusion, except to protect imports belonging to *foreign* commerce, as already

defined." (That is, while it remained in the hands of the importer, for sale, in the original bale, package or vessel in which it was imported. (*Brown vs. The State of Maryland*, 12 *Wheaton*, 419.) "And the reasons," continued Mr. Justice *Catron*, "are obvious. We have no power to inquire into abuses, if such there be, inflicted by State authority on the inhabitants of the State, unless such abuses are repugnant to the Constitution, laws or treaties of the United States."

Said Mr. Justice *Woodbury*, "From the first settlement of this country, and in most other nations, ancient or modern, civilized or savage, it has been found useful to discountenance excesses in the use of intoxicating liquor. And without entering into the question here, whether legislation may not, in this as other matters, become, at times, intemperate, and re-act injudiously to the statutory objects sought to be promoted, it is enough to say, under the general aspect of it, that the legislation here is neither novel nor extraordinary— nor, apparently, designed to promote other objects than physical, moral and social improvement. On the contrary, its tendency is, clearly, to reduce family expenditures, secure health, lessen pauperism and crime, and coöperate with, rather than counteract, the apparent policy of the General Government itself, in respect to the disuse of ardent spirit. They aim, then, at a right object; they are calculated to promote it; they are adapted to no other; and no other or sinister, or improper view can, therefore, either with delicacy or truth, be imputed to these acts."

Finally, Mr. Justice *Grier* said: "It is not necessary, for the sake of justifying the State legislation now under consideration, to array the appalling statistics of misery, pauperism and crime, which have their origin in the use or abuse of ardent spirits. The police power, which is exclusively in the States, is alone competent to the correction of these great evils; and all measures of restraint or *prohibition* necessary to effect the purpose, are within the scope of that authority. There is no conflict of power, or of legislation, as between the States and the United States. Each is acting within its

sphere, and for the public good; and if a loss of revenue should accrue to the United States, from the diminished consumption of ardent spirits, she will be the gainer a thousand fold, in the health, wealth and happiness of the people."

Thus, it will be perceived, that this high tribunal, whose peculiar office it is to protect the Constitution of the United States from all encroachments, and which has manifested, hitherto, no reluctance in the performance of this duty, hold, *nemine contradicente;* that it is competent for a State, in the exercise of its reserved rights and acknowledged jurisdiction, to pass any law which it may deem necessary and advisable to guard the health or morals of its citizens, notwithstanding such law may "discourage importations, or lessen the revenue of the general government;" and that such laws would be entirely defensible, although prohibiting sales, partially or entirely, within the limits of the State.

We have nothing further to add, either by way of argument or authority, to enforce the doctrines of this thorough *States Rights* decision, especially as the proposition has not been seriously controverted by Counsel, that the power of the *States* to regulate the domestic traffic in spirits, is complete, unqualified and exclusive.

2. We are next to consider, whether this right can be delegated to a municipal corporation, to be exercised within its corporate limits.

I need not adduce authorities to show that powers of this and the like character, have been exercised by municipal communities ever since their institution. Indeed, the original idea seems to have been that police regulations belonged, inherently, to those local bodies. The Colonial Act of 1757, regulating taverns, punch houses and retailers of spirituous liquors, is not contained in any of the Digests; but the Act of 1791, after making provision for the State at large, has this section, "*Provided, always,* that the corporation of the city of Savannah and Augusta shall have the sole regulation and power of governing and directing taverns, and granting

licenses within their several jurisdictions." (*Cobb's Digest*, 1037–8.)

So, also, in the Act of 1809. which was the first to separate the retail proper from tavern licenses, and to fix five dollars as the fee for the privilege of vending it is, *Provided*, "That nothing in the Act shall be construed to control the rates which now are or may be established by the corporations of Savannah and Augusta, or *any other incorporated town in this State*." (*Ib.*)

Again, in the XXVIIth section of the 10th division of the Penal Code, where retailing spirits without license subjects the offender to a fine of $50, *incorporated towns or cities* are exempted from the operation of the Act, where, by law, authority to grant licenses is vested in the corporate authorities of such towns or cities. (*Cobb's Digest*, 818.)

Seeing that the power in question has been exercised by the express sanction of the Legislature for sixty-four years at least, without complaint or objection, it may well be insisted that it is legitimated by the habitude of such a length of time, being almost coëval with the State Government itself. And while it may be true, that a bad precedent, suffered to pass *sub silentio*, cannot be set up to justify an abuse in which it originated, especially where the question is one of constitutional law, touching the political organization of the State; still, one may well pause and hesitate to subvert a veteran practice, not only venerable for its antiquity, but one which has worked so harmoniously and well.

The Act of 1791, recognizing the right of Savannah and Augusta to have the sole control over licenses within their several jurisdictions, had been in force seven years when the Constitution of 1798 was adopted. And after being extended, by the Act of 1809, to all other incorporated towns within the State, has remained upon the Statute Book, with immaterial modifications, from that time to this. And now, after the lapse of nearly three-score years and ten, it is first discovered that this whole system of legislation, embracing not only li-

censes, but innumerable kindred topics, is unconstitutional and void.

We concede that this long acquiescence may not, of itself, prove this species of legislation valid; still, its repugnance or incompatibility should be as clear and certain as that the parts are less than the whole, to justify this or any other Court, under such circumstances, to impeach its constitutionality. For let it be announced as the law of the land, that all the police regulations of all the incorporated towns in the State are without authority—that these municipalities have no power, even under a direct grant from the Legislature, to enact health, harbor and quarantine ordinances—to direct the safe-keeping of gunpowder—to institute patrols—to punish petty offences, and to exercise all other powers of a similar character, and a panic would be justly created throughout the State. Sir *James McIntosh* attributes the revival of order and security, industry, trade and the arts, in Europe, and indeed, the civilization of the modern world, in a good degree, to the institution of municipal communities, who are invested with the privilege of managing their own local interests, under the protection of the parent State. And Chancellor *Kent*, *M. De Tocqueville*, and every other philosophical observer, ascribe to the establishment of towns, constituting as they do, small independent republics, not only the high moral and social condition of our people, but even the principal of the life of American liberty, as it exists in this country.

While, therefore, we esteem the duty of preserving the Constitution—Federal and State—intact, as paramount to every other consideration, and should not shrink from applying the appropriate corrective, did we believe that either had been violated; still, seeing, as we do, that the powers delegated to our towns and cities, are exercised so beneficially for the good order, peace, security and welfare of those small communities, we must be convinced, beyond a reasonable doubt, that the Legislature has transcended its legitimate authority, before we could consent to crush, with iron hand, these embryo

republics. The consequences which would ensue, are too tremendous for evil, to be hastily hazarded.

In the great case of *The City of London vs. Wood*, (12 *Modern*, 669,) the Court of King's Bench, (Lord *Holt* presiding,) say, " we must consider the City of London, as all other great towns are to be considered, a community that have a *legislative power* intrusted to them for their better government, and can make laws to bind the property of those who live within that city or precinct, and also of all the strangers, whatsoever, that come within the limits of their jurisdiction ; and it was necessary and convenient they should have such power for the support of their government. And it is so in all countries and forms of Government whatever, whether Monarchy, Aristocracy or Democracy, or whatever form of Government it be, for the supreme jurisdiction cannot have leisure to inspect into the small matters that concern the whole order and regulation of matters within that society or community, as they that are members of it shall. *Hobart*, 221, says that all corporations, as such, have power to make laws and ordinances, and need not special words in their patents to enable them thereunto."

The point in issue, in the second branch of this discussion, was directly made in the case of *The Commonwealth vs. Duquet*, (2 *Yeates*, 493,) one of the positions laid down by Messrs. Rawle & Du Ponceau, Counsel for the defendant was, that the Legislature of Pennsylvania could not confer upon the corporation of the City of Philadelphia, the power to pass ordinances to prevent the erection of wooden buildings in certain parts of the city, as they might judge proper, but that such power must be exercised by the Legislature, directly. But the Court held the law to be constitutional, and the ordinance founded thereon good.

And it is a singular fact, that the modern cases, both in Pennsylvania and elsewhere, which maintain that the Legislature alone is competent to make laws, and that it cannot ordain a new or different power for that purpose, thereby creating an *imperium in imperio*, admit not only that the

case just cited was correctly decided, but concede that all municipal corporations, clothed with the power of making by-laws for the conduct of their concerns, and the government of their members, are free from this constitutional objection. The distinction taken is this : that by-laws are no more than a species of contract between the individual members of the corporation; and in the case of municipal corporations, may be extended to a stranger who comes, voluntarily, within the jurisdiction, upon the principle that his coming is equivalent to an assent to be bound by the local law of the place. Whether there be any substantial difference between the case of municipal corporations enacting by-laws or ordinances, and the delegation of power, by the Legislature, to a majority of a county or township, to decide whether licenses shall be granted within their several limits, it is unnecessary for us to express an opinion. Suffice it to say, that while acts for the latter purpose have been set aside, by some Courts, as nugatory, the former has never been questioned by any legal tribunal in England or America.

3. We come now to the last point to be considered—and that is, has the City of Griffin been vested with authority to pass the ordinance in question ?

The second section of the amended charter of 1854, declares, that " the Mayor and Council of the City of Griffin, shall have full power and authority to pass every by-law, regulation or ordinance, that shall appear to them necessary and proper for the security, welfare and interest of said city ; or for preserving the peace, health, order and good government of the same." (*Pamphlet, p.* 6.)

And the seventh section of the same charter provides : that the Mayor and Council shall have power to license persons to retail, and sell by retail, spirituous liquors within the said city, according to the ordinances thereof. And no person or persons shall sell, by retail, any spirituous liquors within the same, without first obtaining such license." (*Ib.* 7.)

The single inquiry then is, not whether the power in dispute does not reside, inherently, in all corporations, and is

not recognized by the Act of 1809, to exist in all incorporated towns in this State, but whether the right has not been directly delegated to the City of Griffin, by the amended charter of 1854?

And can language be plainer or broader than the words of that charter? Is it not manifest that the Legislature intended to intrust this whole matter of license to the city authorities, within their corporate limits? Have they expressed or intimated any purpose to restrict the comprehensive grant which they made?

It is contended that the price of the license is limited by that clause in the 5th section, which allows the city authorities to levy a tax, not exceeding 50 per cent. on the State tax, "on all persons, professions and property," within the City of Griffin. The response is three-fold. 1st. This is not a tax. 2dly. It does not come within the terms, "persons, professions and property;" and 3dly, if it did, the words, "persons, professions and property," evidently refer to persons, professions and property subject, by law, to State taxes *within the city.* But the State having conferred on the city the right to grant licenses, has thereby ousted herself of this right within the corporate limits. And consequently, there is no State tax, as to licenses, upon which the 50 per cent. could be assessed, under this clause. 50 per cent. can be levied on the amount of taxes paid on all property, real and personal, to the State, situate within the city; also, on the poll-tax, the professional tax paid by lawyers, &c. The *corpus* of the tax, under the public law, goes to the State; the per centage, under the by-law, to the city. But there is nothing going to the State on licenses in Griffin; and therefore, as we have said before, there is nothing upon which to levy the per centage.

Again, it is insisted that a corporation cannot impose a tax beyond that levied by the State, upon the citizens generally. And *Grant, on Corporations (Chapter Bye-laws,)* is relied on to sustain this principle. The text is this: "If, by a public general Statute, *applicable to every subject of the*

*Realm of England*, a penalty of 5s. is imposed for a certain description of offences, and a corporation having rights and powers of a territorial government, pass a by-law affixing the penalty of £5 to the commission of every such offence within their boundaries, such bye-law is said to be bad." (*Page* 88.)

In *Calder Navigation Company vs. Pillong,* (14 *M. & W.* 90, *Per Lord Kenyon, C. J.* 7 *T. R.* 748,) this doctrine was sustained. But *Butcher's Company vs. Morey,* (1 *H. Black.* 370,) *Butcher's Company vs. Bullock,* (3 *B. & Pul.* 434,) *Pierce vs. Barham,* (*Cowper,* 270,) were cases of by-laws, surviving against the principle in the text, and yet held to be valid. Upon authority, then, the doctrine is doubtful. But waiving this reply, there is no conflict of the character contemplated in the present case.

The principle is, that where a Statute imposes a penalty or exacts a duty from *all* the cititizens of the State, that it is not competent for a corporation to increase that penalty or add to that duty. If the Act of 1809, and subsequent Statutes, making five dollars the fee for a license, operated upon the people of Griffin, the rule would apply; but they do not. The State has seen fit to withdraw her general juris-diction over this portion of her people, and substituted, as to them, and as to license, the local legislation in lieu of her own. There is, therefore, no repugnance; and such has been the uniform construction, by our Courts, for more than a half century. We have seen, that since 1791, incorporated towns and cities have been excepted from the general operation of the State Laws, as to the subject of licensing; and that the incorporated towns have regulated the license without regard to the State Law, and have always made the fee higher; and this is right, in itself. The business is more profitable in towns, and should pay for the privilege of vending, in proportion to their profits. In an adjoining State, hotels in cities not larger than Griffin, are willing to purchase a license at $1000, and even $1500; and if I have not been misinformed, receipts at the bar of one of the public houses in this State, located in a city less than the largest size, approximated to

$30,000 in some thirteen or fourteen months. I will not vouch for the accuracy of the statement.

But we need not press this point further; for our brother STARKE, in exacting a fee of fifty dollars of Mr. Ellis, the applicant, not only ignored this proposition, but also the other, which we have heretofore examined, as to the *taxing clause* in the charter; and, we think, rightly.

Again, it is argued that this ordinance is in restraint of trade; and it is stated in the argument, that the decision of the Circuit Court, declaring the by-law a nullity, was mainly placed upon this ground.

The farthest the rule has gone upon this subject is, that by-laws, in restraint of trade, will not be *favored*. (*Grant on Corporations*, 91.) But is not every system of licenses to retail spirits, to some extent, a restraint upon trade? Does not a limitation of five dollars even, lessen the sale of the article? Even the retailer is forbidden to keep a drunken or disorderly house. If this prohibition be observed, will not a less quantity of liquor be sold? But whoever thought of impuning the validity of our license laws on that account? Do not laws which forbid sales and the transportation of freight trains upon the Sabbath, have a tendency to restrain an indiscriminate traffic? Is the law which forbids the sale of spirits to slaves bad? Yet, *none* restrains trade more. This, and numerous other salutary enactments, are a dead letter upon the Statute Book, for want of public prosecutors, and will remain so until the penalty is increased, and one half is given to the informer; and still, more legislation is clamorously demanded, and the State vilified in newspapers and public lectures for not enacting it! I too, was one zealous without judgment, upon this subject; I can, therefore, the more readily excuse others. The provision in the Penal Code against selling the flesh of diseased animals and other unwholesome provisions, is in restraint of trade, and yet subjects the offender to fine or imprisonment, or both, at the discretion of the Court. So, it is criminal to sell adulterated or pernicious liquors, knowing them to be so. How few of

Perdue, Clerk, &c. *vs.* Ellis.

any other sort are vended! ignorantly, of course. Hence, the main cause of such speedy mortality from modern tippling.

To buy or sell a vote subjects the parties to incarceration within the walls of the Penitentiary. How restrictive this policy! To purchase of a slave, without written permit, cotton, tobacco, wheat, rye, oats, corn, rice or poultry, or any other article except such as are usually manufactured or vended by negroes, is a misdemeanor; and a fine of $1000 is imposed upon pedlars and other itinerant traders who deal with slaves, without the permission or presence of their owners. These regulations not only restrain, but extirpate a most lucrative traffic. As far back as 1808, it was made unlawful to sell, or cause to be sold, any wine, cider, beer, whiskey, gin, rum, brandy, or any other intoxicating liquors, within one mile of any meeting-house or other place of public worship, during the time appropriated to such worship. (*Cobb's Digest*, 817.) Interpreting this Act to apply to country churches, we would ask, are not town and city congregations—aye, and schools too, especially female seminaries, equally entitled to immunity from this annoyance?

But it may be replied, that all the cases put, differ from the one at bar in this: that in every instance enumerated, the trade is condemned by the Legislature; whereas, the retail traffic is legalized and approbated by the public law. That it may be legalized by taking out a license, we readily concede. And so it may be in Griffin. But that it is *approbated*, we cannot admit. It is tolerated, just for the same reason that polygamy was suffered by the only wise Law-giver, amongst His ancient people. "But it was not so from the beginning:" nor did it continue under the new and better dispensation.

We deny that the State of Georgia has ever looked to licenses on retail, as a revenue measure. The pittance paid for the privilege of vending liquors, is too small to warrant such a conclusion.

We deny, too, that her position is antagonistic to that of the City of Griffin, touching this traffic. Will it be alleged,

that it is the purpose of Georgia "to debauch the public mor-
als—to encourage a lavish waste of property, and to multiply
crime?" And that, too, from mercenary motives ! Shall it
be pretended that it is her settled policy to make wives wid-
ows, and children orphans, and to wage a war with all the
best interests of society ? We repudiate, in her behalf, an
imputation as unjust as it is unfounded. The provision in
the Penal Code, that drunkenness shall not be an excuse for
any crime or misdemeanor, negatives the imputation, that
the State not only winks at, but approves of the traffic.

She is wise enough to see, that the usages of centuries are
not to be uprooted in a day. Her counsellors have profited
by the lessons of wisdom drawn from the experience of the
past. They have learned, that the imposition of high duties
does not destroy the appetite for spirits; and that no vigi-
lance, on the part of officers, or severity of the laws, can erad-
icate a custom so long indulged and universally practiced;
and that the real effect of all ultra measures have been to
continue the supply through illicit channels; and thus, to
superadd the meanness of concealment to the vice of drunk-
enness. They have studied the history and results of a pre-
mature effort, made by the British Government as early as
1736, to put a total stop to the further use of spirituous li-
quors, except for medicinal, manufacturing and mechanical
purposes.

During the latter part of the reign of *George I.* and the
earliest part of that of *George II.* gin-drinking had become
exceedingly prevalent. And the evils resulting from the
multiplication of grog-shops, were denounced from the pulpit
and in the presentments of Grand Juries, as pregnant with
the most destructive consequences to the health and morals
of the community. At length, Ministers determined to re-
press the mischief effectually. They passed an Act, the pre-
amble of which recites, that "whereas, the drinking of spirit-
uous liquors, or *strong water*, is become very common, and
especially among the lower and inferior rank, the constant
and excessive use of which tends greatly to the destruction of

Perdue, Clerk, &c. *vs.* Ellis.

their health, rendering them unfit for useful labor and business, debauching their morals, and inciting them to perpetrate all vices. And the ill consequences of the excessive use of such liquors, are not confined to the present generation, but extend to future ages, and tend to the destruction and ruin of this Kingdom."

· A duty of *twenty shillings* a gallon was laid on spirits, exclusive of a heavy license duty on retailers. Extraordinary encouragements were held out to informers; and a fine of £100 was ordered to be rigorously exacted from those who were engaged in it even though inadvertence should vend the smallest quantity of spirits which had not paid the full duty.

Here was a Statute sufficiently stringent to satisfy the most clamorous friend of legislation; and that, too, adopted by a *monarchy*, which depends upon *force*, rather than *public opinion*, for the execution of its laws. But instead of the anticipated effects, it produced those directly opposite. The respectable and conscientious dealers withdrew from a trade proscribed by Parliament; so that the business fell almost entirely into the hands of the lowest and most profligate characters, who, as they had nothing to lose, either in character or estate, were not deterred, by penalties, from breaking through all the provisions of the Act. The masses, say the annalists of that period, having, in this as in all similar cases, espoused the cause of the contraband dealers; (and no wonder that they should, feeling, as they do, that all such legislation operates practically, if not so intended, as an odious discrimination against them;) the public officers were openly assaulted in the streets of London and other great towns; informers were hunted down like wild beasts; and drunkenness, disorders and crimes increased with a frightful rapidity. " Within two years of the passing of the Act," says *Tindal,* " it became *odious and contemptible ;* and policy, as well as humanity, forced the commissioners of excise to mitigate the

penalties." (*Continuation of Rapin, Vol.* 8, *p.* 358, *Ed.* 1759.)

The same historian mentions, (*Ib. p.* 390,) that during the two years in question, no fewer than 12.000 persons were convicted for offences connected with the sale of ardent spirits. But no exertion on the part of Magistrates and Ministers could stem the popular current. And according to a statement made by the Earl of Cholmandeley, in the House of Lords, (*Timberland's Debates in the House of Lords, Vol.* 8, *p.* 388,) it appears that at the very moment when the sale of spirits was forbidden as illegal, and every possible exertion made to prevent and suppress it, upwards of *seven millions* of gallons were annually consumed in the City of London alone, and parts immediately adjacent thereto. Finally, Government gave up the unequal struggle, and in 1742, repealed the high prohibitory duties, notwithstanding the vehement opposition of the Bishops and many of the Peers, who exhausted, we are told, all their rhetoric in depicting the ruinous consequences that would follow.

To these declarations it was unanswerably replied, that whatever the evils of the practice might be, it was impossible to repress them by prohibitory enactments, until there was laid, broad and deep, in the mental and moral improvement of the people, a foundation to sustain them; and that any premature attempt to do so, would be productive of far greater evils than had ever resulted, or could be expected to result, from the greatest abuse of spirits.

Similar efforts were made, at a later day, to arrest the progress of demoralization in Ireland and Scotland, resulting from the same cause, which ended equally unsuccessful and unsatisfactorily.

[2.] Now, the State of Georgia, instead of countenancing an indiscriminate traffic, exacts a fee of five dollars, for permission to pursue this business in the State at large, and exacting a bond of five hundred dollars to keep an orderly house, (*one half of the penalty of which should, when recovered, go to the informer, seeing that there is not public spirit*

enough, even amongst the professed friends of good order, to enforce its observance,) at the same time, giving to the incorporated towns a discretionary power over this subject, within their respective limits. Her next movement will be, and that speedily, as we humbly trust, to extend this control and supervision to the Inferior Courts of the several counties—a measure most devoutly desired by all the prudent and practical men of the country, who have reflected most profoundly upon this subject.

Finally, it is assumed that while, by the amended charter, the corporation of Griffin may *regulate*, it cannot *inhibit* the traffic ; and that in the case of Mr. Ellis, at least, the fee of five hundred dollars amounts to prohibition.

The ordinance does not purport, upon its face, to be prohibitory. It is not so, in fact. Judge STARKE required the petitioner to tender fifty dollars as a license fee ; what difference is there between a law which makes the license fee ten times as large as the State license, and one which is ten times larger than that ? It is only in the degree of prohibition, and not in the principle. All are prohibitory, and each would cut off some—none of them all. And it is the small dealers that perpetrate the most mischief, because it is that class that mostly corrupt our slave population.

Admitting, then, that the present ordinance is more prohibitory than that which it superceded, and which the presiding Judge proposed to enforce, does this render the one void and the other valid ? And how much of prohibition must a law contain, more or less, to vitiate it ? We should like to have an intelligible rule upon this point. What rule of arithmetic will the Courts apply to this subject ? The license fee varies in most of our towns, and in all exceeds that paid to the State. Which of these are good and which bad ? We desire a distinct line of demarcation drawn. Ought not the sum to vary according to the profits of the business and other circumstances ? Ought a bar, yielding $25.000 per annum, to pay no more than a cross-road grog-shop ? Can this Court —can any Court—calculate and determine where *regulation*

ends and *prohibition* begins? What means have Courts to ascertain the practical effects of one or another ordinance relative to this subject, both prohibitory, but prohibitory in different degrees? May not this power be wisely left to each local government?

Grant, however, that the present ordinance, in its purpose, end and operation, if not in form, is substantially and practically prohibitory; still, we should hold that the Mayor and Council have not transcended the powers conferred upon them by their charter. And if they believed that the means of social improvement, and the success of their institutions of religion and learning depended, in a measure, upon the stringent exercise of the authority thus delegated, who shall gainsay it?

Upon glancing, as we have done, cursorily over the code of this young but rapidly rising city, we see much to admire. And with the knowledge, that if the trust bestowed by the parent State has been abused in this instance, the corrective is with the local constituency, we deem it our duty to reverse the judgment of the Circuit Court, which denied that the Mayor and Council of the City of Griffin had the right to pass the ordinance now under consideration.